IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  10-cv-02662-LTB

TRUDI DIETZ,

        Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.
_____

ORDER
_____

Plaintiff, Trudi Dietz, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral arguments will not materially aid in the resolution of this appeal.  After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the SSA Commissioner's final order.

## I.  STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her February 4, 2008 application for Social Security disability insurance benefits. [Administrative Record ("AR") 72]  The application was initially denied at the administrative level. [AR 42]  An Administrative Law Judge ("ALJ") subsequently conducted a hearing on August 20, 2009, and issued a written ruling on October 14, 2009, denying Plaintiff's application on the basis that Plaintiff was not disabled because she was capable of performing her past relevant work in light of her assessed residual functional capacity (Step Four). [AR 6, 18, 20]  On October 7, 2010, the

SSA Appeals Council denied Plaintiff's administrative request for reconsideration, making the denial final for the purpose of judicial review. [AR 1]  Plaintiff timely filed her complaint with this court seeking review of the SSA Commissioner's final decision.

## II.  FACTS

Plaintiff was born on March 21, 1955, and was 54 years old at the time of the ALJ's decision. [AR 40, 69, 74]  Her prior work history consists of cashier and door greeter, assayer in a gold mine and wafer quality inspector.  [AR 103, 133]  Plaintiff alleges that she became disabled on June 15, 2005, due to "chronic back pain, bulging discs and carpal tunnel syndrome." [AR 74, 98, 102]

The medical records reveal that prior to her alleged onset of disability date of June 15, 2005, Plaintiff underwent right thumb surgery in 1999 [AR 361-364], and left-hand carpal tunnel release surgery in 2003. [AR 307-14, 315-26, 327-48]  In addition, she had surgery on her left knee in early 2005. [AR 352-60, 379-86]   These conditions were treated and resolved, there is and no evidence in the medical records of follow-up treatment or any additional future issues.

Beginning in June of 2005, through September of 2006, Plaintiff saw family physician Gary Mohr, M.D., for treatment of pain when she began having lower mid-back pain after reaching for something on a shelf. [AR 222, 224]  At that time, initial x-rays noted "mild degenerative disk disease" of the lumbar spine and degenerative disc disease of the thoracic spine. [AR 220]  Dr. Mohr treated Plaintiff with prescription pain and muscle spasm medication. [AR 168, 179, 184, 192, 197, 203, 207, 211]  Over the course of his treatment of Plaintiff, Dr. Mohr recommended only conservative treatment options,  including exercises and physical therapy (in March 2006), and physical therapy, massage, stretching, and a warming cream (in

September 2006).  [AR 166, 192]  In July 2006, an MRI of Plaintiff's lower spine showed mild thoracolumbar scoliosis, moderate degenerative changes and mild disk bulges at multiple vertebrae levels, and minimal narrowing of the spinal canal at one vertebra level. [AR 231]

The record shows that in May and June of 2006, Plaintiff saw Richard Stockelman, M.D., complaining of right shoulder pain. [AR 387-89]  An MRI at that time showed a partial-thickness right rotator cuff tear. [AR 387]  Because Plaintiff refused treatment of a cortisone injection or an oral steroid, Dr. Stockelman indicated that she either needed to "live with her symptoms" or consider arthroscopic surgery to remove damaged or unhealthy tissue, and to repair the rotator cuff if it was found to be a full thickness tear. [AR 387-89] The records do not indicate any further treatment for Plaintiff's shoulder pain.

In October of 2006, Plaintiff began seeing Julius Budnick, M.D. for treatment of her back pain, including monthly trigger point injections.  [AR 22, 235-50]  X-rays taken in November of 2006 revealed slight narrowing or degenerative disk disease at one vertebra level in the low spine (L5-S1) – as indicated by slightly narrowed disk with minimal disk degenerative changes also present – but no abnormal displacements and a normal pelvis. [AR 229-30]  Dr. Budnick treated Plaintiff by prescribing medications, including painkillers, and also administered trigger point injections through July of 2009.  [AR 235-48, 272-92, 366-78]

In November 2007, Plaintiff received a low spine epidural steroid injection, but reported it made her pain worse. [AR 225-27]   X-rays in February 2008 showed stable degenerative changes including marked disk narrowing at one vertebra level in the low spine, but no abnormal displacements.  [AR  228]  A February 2008 MRI showed minimal to mild, or "stable" degenerative changes, in the low spine, without any narrowing of the cervical spine canal or any

nerve root contact, and the radiologist noted no significant changes when compared to a prior MRI. [AR 228, 295-96]

In March 2008, Plaintiff saw orthopedic surgeon Roger Snug, M.D. for a surgery consultation related to her back pain. [AR 258-60] After examining her, Dr. Snug stated that surgery was not indicated for Plaintiff. [AR 260] He also stated that he did not think Plaintiff could undergo surgery because she could not tolerate anyone touching her back. [AR 260]

In January of 2009, x-rays showed minimal degenerative disk disease in her cervical spine, but no fractures, abnormal displacements, or significant narrowing of the spinal canal. [AR 304] An MRI on the same date confirmed mild degenerative changes; specifically, the MRI indicated central disk herniation and mild narrowing at C6-C7, and spondylosis with mild stenosis at C5-C6 (with right foraminal narrowing), and mild diffuse bulging annulus with mild central stenosis, and mild left foraminal narrowing at C4-C5. [AR 305]

The medical records next indicate that in June 2009, Plaintiff reported gradually worsening pain and loss of function of her left thumb to Dr. Eric Carlson, M.D., an orthopedic surgeon. [AR 350-51] Dr. Carlson surgically excised the bone at the base of Plaintiff's left thumb and reconstructed the carpal ligament. [AR 350-51] In his notes Dr. Carlson noted that Plaintiff had this same procedure performed on her right thumb in 1999, and she had done well over the subsequent 10 years. [AR 350]

At some point, Dr. Budnick completed an undated form titled "Ability to Do Work-Related Activities (Physical)" in which he indicated that Plaintiff's diagnosis was "cervical/lumbar DDD-severe." [AR 299-303] He opined that, in an eight-hour workday, Plaintiff could: lift and/or carry six to 10 pounds occasionally and five pounds frequently; sit,

4

stand, and walk for less than one hour each; never climb ladders; rarely bend or flex her neck; and never climb, kneel, crouch, crawl, or squat. [AR 299-301]  He also indicated Plaintiff would need to alternate positions at-will to relieve discomfort and should avoid concentrated exposure to extreme temperatures and humidity, and mild exposure to unprotected hazards. [AR 300]  Dr. Budnick indicated that Plaintiff had no limitations as to fingering (fine manipulation), handling (gross manipulation), or reaching in all directions (including overhead). [AR 300]

A state agency physician and orthopedic specialist, Dr. M. Susman, M.D., evaluated Plaintiff's medical records and assessed her physical residual functional capacity in April of 2008. [AR 261-68]  In a "Physical Residual Functional Capacity Assessment" form, Dr. Susman noted that Plaintiff's back pain had been treated conservatively, and normal strength and sensation examination findings. [AR 262]  Dr. Susman opined that, in an eight-hour workday, Plaintiff could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours; sit about six hours; never climb ladders; and occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. [AR 262-63]  He indicated that Plaintiff should avoid heights and unprotected machinery where sudden evasive movement might be necessary. [AR 265]  Finally, Dr. Susman indicated that Plaintiff had no manipulative limitations, and opined that the medical record did not support a diagnosis of carpal tunnel syndrome. [AR 264, 266]

### III.  LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II of the Social Security Act which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.§ 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(e)&(f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. §

404.1520(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since her onset date of June 15, 2005 (Step One). [AR 11]  The ALJ also found that Plaintiff had the following severe impairments:  degenerative disc disease of the lumbar spine, cervical spine, thoracic spine, and arthritis in both thumbs (Step Two). [AR 11]  However, because the ALJ determinated that she did not have a impairment or combination of impairments that meets or equals a listed impairment (Step Three), the ALJ went on to assess Plaintiff's RFC. [AR 13]

The ALJ then evaluated the evidence and found that during the relevant time period Plaintiff retained the RFC to do work at the light extertional level, but that she was limited to occasional bending, squatting, kneeling and climbing.  In addition, she was restricted from performing above chest-level work, and from repetitive keyboarding, and – in deference to her recent thumb surgery – she could only occasionally grip or grasp items with any force (Step Three). [AR 13]  In light of Plaintiff's RFC assessment, the ALJ found that she was capable of performing her past relevant work as an assayer, wafer quality inspector, cashier, and as a greeter (Step Four). [AR 18]  Thus, the ALJ denied Plaintiff's application because she was not under a disability from June 15, 2005, as defined by the SSA at Step Four of the sequential evaluation process. [AR 18]  On review, the Appeals Council "found no reason" to reconsider the ALJ's decision. [AR 1]

## V.  STANDARD OF REVIEW

My review here is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). My review of the factual findings is to determine whether they "are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

## VI.  APPEAL

Plaintiff's arguments on appeal are that the ALJ erred when assessing her residual functional capacity ("RFC") at Step Four in the sequential process. Because I find no error by the ALJ, I reject the Plaintiff's arguments as follows.

<u>Dr. Boland</u>

I first address Plaintiff's argument that the ALJ erred in failing to consider a medical opinion, contained in the record, from Jim Boland, M.D., an occupational medical therapist. Dr. Boland treated Plaintiff for occupational injuries in 2002 and 2003, including surgery and rehabilitation for carpal tunnel syndrome in her left hand. In November of 2003, Dr. Boland concluded that Plaintiff had reached maximum medical improvement – for purposes of her workers compensation claim – and assigned her "permanent" work restrictions, including a maximum of 10 pounds lifting, and "no repetitive grasping or keyboard work." [AR 327]

Plaintiff argues that the ALJ did not mention, and therefore did not consider, Dr. Boland's opinion when assessing her RFC. Plaintiff argues that the SSA regulations require that

the ALJ specifically consider and assess all the medical opinions in the record. *See* 20 C.F.R. §404.1527(b)("we will evaluate every medical opinion we receive"); §404.1527(f)(2)(ii)(the ALJ "must explain in the decision the weight given to the opinions . . . from treating sources, nontreating sources, and other nonexamining sources who do not work for us"); and SSR 96-8p. Plaintiff argues that the ALJ's failure to specifically address Dr. Boland's opinion here constitutes reversible error.

The Commissioner asserts, in response, that Plaintiff's argument should be rejected because Dr. Boland's opinion was not relevant in that it related to treatment for a condition which occurred and resolved nearly two years prior to Plaintiff's alleged disability onset date of June 2005. As the ALJ found, the record demonstrates that after her August 2003 surgery, Plaintiff improved and did not complain of or seek any further treatment for any carpal tunnel symptoms on her left hand. [AR 11-12, 14, 17]   Specifically, the ALJ found that her "carpel tunnel problems were surgically corrected in 2003, substantially before her alleged onset date for this Title II claim," and as a result "the carpal tunnel allegations . . . are [not] addressed in this decision, because they are found to be nonsevere impairments." [AR 12]   After addressing the medical records related to Plaintiff's August 2003 surgery, the ALJ found that "[t]here is no evidence of any follow up care, treatment or physical therapy for [Plaintiff's] carpal tunnel complaints after November 5, 2003." [AR 14]   Then, when assessing the Plaintiff's RFC, the ALJ indicated that he considered all of the opinion evidence in the medical record and, in so doing, noted the Plaintiff's "surgical intervention outside the relevant period of this claim." Such procedures "include carpal tunnel releases of both the right and left arm" and "[t]he record of these procedures is significant particularly for its lack of evidence that [Plaintiff] pursued or

obtained follow up care or treatment to improve her situation, [and] there is no evidence that she ever requested or obtained physical therapy after any of these procedures." [AR 14]

While Plaintiff is correct that the ALJ's order is devoid of any discussion of Dr. Boland's conclusion when he released her to return to work after her worker's compensation claim, I agree with the Commissioner that this is because the ALJ determined – with sufficient support in record – that Dr. Boland's records and opinions were simply not relevant to the claims or time period at issue. *See Hunter v. Astrue,* 321 Fed.Appx. 789, 794, 2009 WL 1040126, 4 (10th Cit. 2009)(not selected for publication)(medical evidence that comes from outside the relevant period is pertinent only if it illuminates the claimant's condition during the relevant period).

Dr. Budnick:

Plaintiff next argues, that the ALJ erred in rejecting the opinion of her treating physician, Dr. Budnick, related to Plaintiff's functional limitations; specifically, his opinion that Plaintiff's ability to work is limited in that:  she is unable to lift and carry more than 10 pounds; she has a significantly reduced tolerance for prolonged sitting, standing and walking, and needs to change positions frequently and will sometimes need to lie down at unpredictable intervals; she will be frequently distracted by her pain and other symptoms; she is likely to miss work on an unpredictable basis; and she is not able to function as a reliable, consistent worker. [AR 299-303]

In his order, the ALJ gave little weight to Dr. Budnick's opinions related to Plaintiff's functional abilities.  [AR 17]  In so doing, the ALJ set forth the following reasons for his determination that the opinion was not well-supported.  First, the ALJ noted that when Dr. Budnick was required to indicate what findings supported his medical assessments of Plaintiff's

10

ability to do work, he only indicated that they were supported by Plaintiff's MRI reports. [AR 17]  The ALJ noted that "[i]n fact, he referred the reader to the MRI reports at least 6 times in the course of this assessment.  However, as previously discussed, the MRI reports clearly describe [Plaintiff's] spine disorder as mild, moderate and stable.  The word severe is not found on any MRI or x-ray report. . . . Dr. Budnick's diagnosis referred only to [Plaintiff's] lumbar spine, in contrast to the cervical spine evaluation found in the January 2009 MRI report." [AR 17]  The ALJ indicated that Dr. Budnick's records note a diagnosis of degenerative disc disease of the lumbar spine only. [AR 15] Therefore, for those reasons, as well as "Dr. Budnick's clear reluctance to provide relevant medical information, his opinion is given little medical weight." [AR 17]

     Plaintiff first asserts that the ALJ erred by failing to give Dr. Budnick's opinion related to her functional limitations "controlling weight," because it is well supported by medically acceptable clinical and laboratory techniques and is consistent with the medical records.  She argues that the referenced MRIs "demonstrate degenerative changes affecting multiple areas throughout her spine, including her disc and facet joints," that "are capable of producing pain that would limit her ability to perform basic activities such as lifting, standing, walking and sitting."  Plaintiff also refers to clinical findings contained in the medical records from Dr. Mohr that she contends document findings consistent with severe back pain and resulting function limitations even though they were not noted or contained in Dr. Budnick's assessment.  I disagree.  I find that the reasons provided by the ALJ in support of his determination that Dr. Budnick's opinion was entitled to little weight were sufficient.  Because the opinions were not supported medically acceptable clinical and laboratory techniques, and there was contrary

evidence in the record, the ALJ was entitled to give his opinions less than controlling weight. *See Langley v. Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004); *Castellano v. Secretary of Health and Human Services,* 26 F.3d 1027, 1029 (10th Cir. 1994)(noting that an ALJ may reject a treating physician's opinion if the conclusions therein are not supported with specific findings).

Plaintiff also argues, in the alternative, that the ALJ should have given Dr. Budnick's opinion about her functional limitations "substantial weight" after considering the factors set forth in 20 C.F.R. § 404.1527 (the existence and length of a treating relationship; the frequency of examination; the nature and extent of the treatment relationship; the degree to which the medical source presents evidence to support the opinion; the consistency between the opinion and the record as a whole; whether or not the source is a specialist; and other factors).

The ALJ's order does not include an explicit discussion of each factor, but instead adequately reflects that the ALJ considered them in his weight calculation. *See Andersen v. Astrue,* 319 Fed.Appx. 712, 719 (10th Cir. 2009)(not selected for publication); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)("[t]hat the ALJ did not explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review" ). As to the existence, length, nature and extent of the treating relationship, the ALJ found that Plaintiff did not establish long term treating relationships with the majority of her providers, and that the longest relationship was with Dr. Budnick, in the form of treatment trigger point injections over a period of three years. [AR 17] The ALJ noted that "Dr. Budnick's records reveal that he maintained a conservative course of treatment including prescription pain medications [and] monthly trigger point injections." [AR 15] As to the degree to which the medical source presents evidence to support the opinion, and

the consistency between the opinion and the record as a whole, the ALJ clearly articulated the reasons that Dr. Budnick's opinions were not supported by the medical evidence of record, as discussed above.  Finally, although the ALJ's order does not note whether Dr. Budnick was a specialist, it is clear that the ALJ understood that he provided treatment in the form of monthly trigger point injections. [AR 15]  As such, I conclude that the ALJ's order adequately articulates the reasoning supporting his decision to give Dr. Budnick's opinion little weight such that later reviewers can identify both the weight that was actually assigned to the opinion and the reasons for that weight.  *See* SSR 96-2p; *Bussell v. Astrue*, 2012 WL 718995, 3 (10th Cir. 2012)(not selected for publication).

Functional Limitations:

Finally, I reject Plaintiff's argument to the extent that she asserts that the ALJ erred when he determined that several of her claimed impairments – for carpal tunnel syndrome, right shoulder pain and degenerative joint disease in her knees – did not result in functional limitations.  To the contrary, although he determined that these impairments were outside the relevant time frame, the record reveals that he considered and incorporated limitations related to these impairments within his RFC assessment.

The ALJ determined that Plaintiff could do work at the light extertional level, but with several limitations. First, she was limited to only occasional bending, squatting, kneeling and climbing, and was restricted from performing above chest-level work. Significantly, she was restricted from repetitive keyboarding, and – in deference to her recent thumb surgery – she could only occasionally grip or grasp items with any force. [AR 13] As such, I find that the ALJ did incorporate her functional limitations – as were supported by the medical records – related to

impairments for carpal tunnel syndrome, right shoulder pain and degenerative joint disease in her knees.

Accordingly, I AFFIRM the SSA Commissioner's final order.

Dated: June __18__, 2012, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE